# EXHIBIT A

Page 18

1           Syed Doha
2     Q.  So the technology for delivering online
3  video that Oflo Video was formed to deploy was then
4  never created; is that correct?
5           MR. CHOCIEY:  I will object to the form of
6     the question, but you can answer, Mr. Doha.
7     A.  Your question is an assumption.
8     Q.  How so?
9     A.  That offline -- Oflo Video was created to,
10  for online video delivery is not connected to Mient
11  player is an assumption.
12     Q.  I'm not making any assumption in my
13  questions.
14         My question is simply, was the technology
15  for delivering online video that Oflo Video was
16  formed to deploy, was that technology ever created?
17     A.  Technology was never created because this
18  kind of technology is never stopped created.
19         (Previous answer was read.)
20     Q.  I don't think I understand your answer,
21  Mr. Doha.  The text of it says, this "Technology was
22  never created because this kind of technology never
23  stopped created"; is that what you meant to say?
24     A.  Never stopped being created, yes.
25     Q.  Never stopped being created?

Page 19

1           Syed Doha
2     A.  Yes.
3     Q.  This technology continues to be created
4  even today?
5     A.  No.
6     Q.  When did development of this technology
7  stop?
8     A.  Which technology?
9     Q.  The technology we're talking about that
10  was the online-video-delivery technology that Oflo
11  Video, Inc. was formed to commercially deploy.
12     A.  I don't, I don't remember when it stopped.
13     Q.  When did it start?
14     A.  Around 2000.
15     Q.  What is your best estimate as to when
16  development on that technology stopped?
17     A.  I would say sometimes 2011.
18     Q.  Why did it stop?
19     A.  Do I have to answer that question?  Lack
20  of resources and funding.
21     Q.  Did that technology ever have a name?
22     A.  Yes.
23     Q.  What was that name?
24     A.  Oflo.
25     Q.  Is Oflo an acronym for anything?

Page 20

1           Syed Doha
2     A.  Yes.
3     Q.  What is it an acronym for?
4     A.  Online Full-Screen Live and On-Demand
5  Video.
6     Q.  What relationship if any did Oflo have to
7  the Melothe project?
8           MR. CHOCIEY:  Object to the form of the
9     question.  You can answer.
10     A.  That was, that was the general term of the
11  video-delivery system.
12     Q.  Which was Melothe or Oflo?
13     A.  Oflo, I just described the acronym, you
14  could transplant that for the very first answer I
15  gave you, video-delivery system.
16     Q.  So my question is, what was Oflo's
17  relationship to the Melothe project?
18     A.  Oflo Video, the company itself or just --
19     Q.  No, Oflo, the online-video-delivery
20  technology.
21     A.  That it would create products, it would
22  eventually, you know, turn into products that would
23  be, you know, do business on the Melothe project's
24  business.
25     Q.  Okay.  So are you telling me that Oflo was

Page 21

1           Syed Doha
2  one of the technologies housed under the umbrella of
3  the Melothe project?
4           MR. CHOCIEY:  Object to the form of the
5     question.  You can answer, Mr. Doha.
6     A.  You can say that.
7     Q.  Was the Mient player another technology
8  housed underneath the umbrella of the Melothe
9  project?
10           MR. CHOCIEY:  Same objection.  You can
11     answer.
12     A.  It could be considered derivative rather
13  than -- derivative of the Oflo Video delivery
14  system, per se.
15     Q.  The Mient player is derivative of the Oflo
16  project?
17     A.  Yes.
18     Q.  Besides Oflo and the Mient player, were
19  there any other technologies being developed in the
20  context of the Melothe project?
21     A.  I have to note that the term "Melothe
22  project" is coined by you in my last deposition.
23  This was not my -- we came to an agreement because
24  of the complexity and, as I indicated in my last
25  testimony, that the status, inchoate status of all

6 (Pages 18 to 21)

One Penn Plaza, NYC                    Toby Feldman, Inc.                       (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Page 22

1       Syed Doha
2  of what we were doing, we came to an agreement but
3  that the term was coined by you. And I'm okay with
4  that.
5       MR. CHOCIEY: Okay.
6    A.  And having said that, sorry, I don't know
7  the question that you asked.
8    Q.  Sure. Let's do that as a housekeeping
9  matter. This overall project to develop certain
10 video-delivery technologies, including but not
11 limited to Mient and Oflo, that project which I have
12 called the Melothe project --
13   A.  Okay.
14   Q.  -- we agreed that it was a project, but
15 that project in general was referred to as Melothe
16 by you and the other people working on it, correct?
17   A.  Correct.
18   Q.  Therefore, throughout this deposition,
19 just as in the last deposition, if I refer to that
20 overall project as the Melothe project, will you
21 know what I'm talking about?
22   A.  I would. I'm just stating that the term
23 was coined by you, because in one question you say
24 the term was coined by me. That was not the case.
25   Q.  Fair enough. But the Melothe part of it,

Page 23

1       Syed Doha
2  that part was coined by you and the group of people
3  working on that project as the way they referred to
4  it on a day-to-day basis; is that right?
5    A.  Let's go with that. I'm trying to, you
6  know, you know, not, you know, yes, Melothe project
7  is good. Let's go with that, okay.
8    Q.  So the question then was, besides Mient
9  and Oflo -- strike that.
10      My question is, besides the Mient player
11 and the Oflo system, were there any other
12 technologies that were ever in development under the
13 umbrella of the Melothe project?
14   A.  As long as we don't get to the word you
15 now use, "system," like in general terms, no.
16   Q.  What if anything concerns you about my use
17 of the term "system"?
18   A.  I don't know what you mean by that.
19   Q.  Okay. You never decided which corporation
20 in that family of corporations would own and operate
21 the Melothe project, correct?
22   A.  No.
23   Q.  Were you a corporate officer of Oflo
24 Video, Inc.?
25   A.  I'm not sure.

Page 24

1       Syed Doha
2    Q.  Were you a member of the board of
3  directors?
4    A.  No.
5    Q.  Did it have a board of directors ever?
6    A.  No.
7    Q.  Did it ever have any meeting minutes?
8  Strike that.
9       Did it ever have any board meetings?
10   A.  Not that I remember.
11   Q.  Do you know if Oflo Video, Inc. ever had
12 any corporate officers?
13   A.  No.
14   Q.  Did it ever have any employees?
15   A.  Oflo Video? Jesse Rosenblatt.
16      THE REPORTER: I'm sorry?
17   A.  The answer is yes.
18   Q.  Is Jesse Rosenblatt the only employee Oflo
19 Video, Inc. ever had?
20   A.  Yes, as far as I can remember, yes.
21   Q.  Did Oflo Video, Inc. ever keep any
22 financial records?
23   A.  I don't have any idea.
24   Q.  Has it ever filed taxes?
25   A.  Not that I know of.

Page 25

1       Syed Doha
2       MR. CHOCIEY: Filed tax returns you mean?
3  Your question was have they ever filed taxes.
4  You mean filed tax returns?
5       MR. DU WORS: Correct. And he's answered.
6    Q.  Has Oflo Video, Inc. ever had any assets?
7    A.  Not that I know of.
8    Q.  Has it ever had insurance?
9    A.  Not that I know of.
10   Q.  Although you didn't have a title at Oflo
11 Video, Inc., you were the person most in charge with
12 respect to that corporation; is that correct?
13   A.  That's correct.
14   Q.  And if in fact you were a shareholder of
15 Oflo Video, Inc., do you have any idea what
16 percentage of ownership you would have held?
17      MR. CHOCIEY: Object to the form of the
18      question. It's speculative. You can answer to
19      the best of your knowledge.
20   A.  What percentage was the question? I
21 don't, I don't remember.
22   Q.  At any point had you and Marc Farinella
23 reached any tentative agreement as to what
24 percentage he might own of any of the corporations
25 that you and he formed together?

One Penn Plaza, NYC                Toby Feldman, Inc.              (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS  (800) 246.4950

Page 82

1        Syed Doha
2    A.  No, it's, it's, it's, yeah, the answer is
3  yes. And it was actually his suggestion that he
4  also should, you know, be my personal lawyer or, you
5  know, take care of my, you know, civil-related
6  business as well.
7    Q.  So you knew at the time that to the extent
8  that Jesse Rosenblatt was actually entitled to be
9  paid under this agreement that you were promising to
10 pay that personally?
11       MR. CHOCIEY: Object to the form of the
12    question.
13   A.  Entitled to pay as what?
14   Q.  To the extent that Jesse Rosenblatt
15 actually did his job and was entitled to pay under
16 this agreement, you understood that you were
17 promising to be responsible for that pay personally?
18       MR. CHOCIEY: Same objection. You can
19    answer.
20   A.  Yeah, that is my, that was my
21 understanding, yes.
22   Q.  Did Jesse Rosenblatt -- okay, I don't want
23 to confuse you.
24       So, essentially, you considered Jesse
25 Rosenblatt to be an employee of the Melothe project,

Page 83

1        Syed Doha
2  even though Oflo Video was the entity named on the
3  agreement?
4        MR. CHOCIEY: Object to the form.
5    A.  That's, that's a fair statement, yes.
6    Q.  Okay.
7    A.  What, what, again, when the agreement was
8  signed, the Melothe project is like our invention,
9  the idea of that company to continue was the idea,
10 but Mr. Rosenblatt himself came up with ideas to
11 create companies here and suggested that we do that.
12       So, so he, yes, he would be the part of
13 the, pretty much the transition team, per se,
14 transition from when the transition was decided.
15 I'm not, I don't remember when the transition was
16 decided at that time, certainly not at that time.
17 I'm not, I'm not, I can't recollect that, when
18 whatever was decided.
19       No, you know what? We're not going to be
20 in Florida anymore, it would be all in New York.
21 But doing the companies, you know, creating the
22 companies in New York was certainly one of the
23 suggestions put forth by Mr. Rosenblatt.
24       MR. CHOCIEY: Can I just clarify? When
25    you referred to the Melothe project was our

Page 84

1        Syed Doha
2  invention --
3        THE WITNESS: Meaning, meaning in terms of
4  the project, meaning Mr. Du Wors and I.
5        MR. CHOCIEY: The language that you're
6  using at your deposition?
7        THE WITNESS: Yeah, because this is, this
8  is just for the purpose of, you know, how
9  complicated this situation was.
10   A.  Right? Is that fair?
11   Q.  Sure. I mean, yeah. And in fact, I'd
12 love to tell you how I understand it and have you
13 tell me if I'm understanding it correctly.
14       You had a bunch of entities, but the
15 business itself was never officially designated as
16 being housed under one of those entities, it was
17 just this Melothe project that was the business that
18 employed Jesse Rosenblatt and that you were all
19 working on together.
20       And there was an intention, at least at
21 this point, to transition the entire business as a
22 going concern into a New York entity as opposed to
23 the Florida entities that had been preexisting but
24 that that transition never was formally consummated.
25 Is that accurate?

Page 85

1        Syed Doha
2        MR. CHOCIEY: I'm sorry, I'll object to
3  the form of the question. You can answer.
4    A.  I mean, I kind of, I'm not nitpick, but I
5  kind of don't agree with the bunch of companies
6  because there were only two companies. That was,
7  you know, before Mr. Rosenblatt came in, there were
8  only two companies, Oflo Video and Melothe, Inc.,
9  Florida.
10       So I, I take a little, you know, little
11 offense of bunch-of-companies part. Bunch-of-
12 companies part was all Mr. Rosenblatt's idea. So
13 that happened later.
14       But let's, for the purpose of moving, yes,
15 the transition, the transition should be only one,
16 transition meant only one thing, location or state,
17 from Florida to New York.
18   Q.  So Mient, Inc. hadn't been created as of
19 the time this employment agreement was entered into
20 yet; is that right?
21   A.  That is, that is at least my recollection.
22   Q.  And Oflo, Inc. wasn't created until
23 January 2011?
24   A.  I don't know when these companies were
25 create, certainly not, as per my recollection, not

22 (Pages 82 to 85)

One Penn Plaza, NYC                Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS       (800) 246.4950

## Page 86

```
 1              Syed Doha
 2   at this time, no.
 3        Q.  As of the time this employment agreement
 4   was entered into, Melothe, Inc. was the only entity
 5   that could have housed the Melothe project, and this
 6   agreement occurred contemporaneous with a plan to
 7   transition the business from Melothe, Inc. into Oflo
 8   Video, Inc.?
 9        A.  No, because probably you're not -- let me
10   clarify.  Melothe, Inc. and Oflo Video both would
11   have existed if I've ever not met Mr. Rosenblatt
12   because, you know, the idea always was that if
13   anytime there are, you know, the project, you know,
14   the make, the creating of the, you know, video-
15   services system or whatever we're calling it is
16   finished, then the intellectual property, if there
17   was any, would be held by one company, but the other
18   company would be the operating company.
19           So there would be two companies no matter
20   what the two companies becoming.  Then the idea was
21   to bring the two companies from Florida to New York,
22   because I'm here and we are all here and I was not
23   going to go to Florida much.  So the first idea was
24   to bring the two companies to New York.
25           You know, my intention was to keep the
```

## Page 87

```
 1              Syed Doha
 2   names the same, but then the bunch-of-companies
 3   idea, that was, that came from Mr. Rosenblatt.  So
 4   when you said you had a bunch of companies and they
 5   were, Mr., that the core team was employed to do the
 6   bunch of companies' business, that's not a true,
 7   that's not a correct statement.
 8        Q.  Okay.
 9        A.  All right?
10        Q.  Makes sense.
11           MR. DU WORS:  So let's see.  May I have
12   this marked as Exhibit 2.  Counsel.
13           (Plaintiff's Exhibit 2, Consulting
14       Agreement, marked for identification, as of
15       this date.)
16        Q.  Mr. Doha, before you is a document that's
17   been marked for identification as Deposition
18   Exhibit 2.  I assume this is the other agreement you
19   mentioned a few minutes ago --
20        A.  Mm-hmm.
21        Q.  -- that you expected me to show you.
22        A.  Mm-hmm.
23        Q.  You're right.  So let me just make a clean
24   record.  You recognize this agreement, right?
25        A.  I do.
```

## Page 88

```
 1              Syed Doha
 2        Q.  Okay.  This is your consulting agreement
 3   with Jesse Rosenblatt?
 4        A.  Mm-hmm.
 5        Q.  And that's your signature on the last
 6   page?
 7        A.  Yeah.  Let me look at it.  Yes.
 8        Q.  Why have two agreements?
 9        A.  That is, that is why the ridiculousness.
10   I mean, you think about it.  You are, you are a
11   legal professional.  I mean, why would anyone have
12   two agreements doing the same -- no, I'm not
13   finished.
14        Q.  I wasn't going to speak.  Please go ahead.
15        A.  Why would you have two agreements?  And
16   this person is employed full time.  I mean, he has
17   one employment under his name and another for his
18   consulting agreement.  And just now I also found out
19   that on top of this, he is going to continue to do
20   business off his own shop.  Very ridiculous
21   position, right?  I think so.
22           But let me, let me tell you what was
23   behind it.  Mr. Rosenblatt, when he agreed to work
24   with me, was very, I would say, very enthusiastic,
25   saying this is a good cause and I'm not going to go
```

## Page 89

```
 1              Syed Doha
 2   to the point of cause yet.  You may ask me that
 3   question.  Of course you can ask me any question.
 4           But so he basically said I'll give up my
 5   own practice and come join you because it's so
 6   exciting.  Of course then it was decided verbally
 7   between he and I first that I could only pay
 8   somewhere around $80,000 a year, no more than that,
 9   you know.  At that time company didn't have any
10   funding from anything other than myself, anything
11   other than myself.
12           So this is what one day he says, said, you
13   know, I'm, you know, giving up the practice and, you
14   know, I would probably would have made more than
15   $80,000 a year in that practice, which I thought
16   was, you know, a fair statement for a lawyer.  I
17   mean, you probably make a hundred times that, but I
18   thought that was, that was a fair thing to say.  But
19   I said, you know, you can say whatever, Jesse, but I
20   don't have, and I won't, this company won't have,
21   you know, anymore money to pay.
22           Then he comes and tells me, well, one day
23   do you think we will be funded and do you think we
24   will do well?  Well, that is what I hope to happen.
25   So then he comes with the idea -- and this is before
```

23 (Pages 86 to 89)

One Penn Plaza, NYC                  Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS         (800) 246.4950

Page 138

Syed Doha

1 trusting this guy 100 percent. I mean, actually my
2 expectation was that every single time any other
3 agreement, including other people's employment
4 agreement, which he was supposed to draft, should
5 come to me to sign the last page.
6     That, that is what I, that was the main
7 reason of hiring Jesse Rosenblatt, that I trusted
8 him to take care of my contracts. I hated
9 contracts.
10    Q.  Why didn't you have Ira Pollack review the
11 Rosenblatt employment agreement and the Rosenblatt
12 consultant agreement?
13    A.  Because I didn't consider Ira Pollack a
14 part of the company.
15    Q.  Well, he was your personal attorney
16 starting as early as early 2010, right?
17    A.  Yes.
18    Q.  So he was your attorney at the time of
19 this?
20    A.  Yes.
21    Q.  You understood yourself to be a personal,
22 a party to this agreement --
23    A.  Correct.
24    Q.  -- in your individual capacity?

Page 139

Syed Doha

1    A.  Correct.
2    Q.  But you didn't --
3    A.  I know, didn't --
4    Q.  We have to slow down.
5    A.  Go ahead, yeah.
6    Q.  But you didn't consider having Ira
7 Pollack, your personal attorney, review this
8 agreement that you were going to be a party to?
9    A.  No, I did not, because I did not -- I
10 trusted Jesse, Jesse Rosenblatt, not -- as more than
11 I trust Ira Pollack.
12    Q.  Why is that?
13    A.  Don't ask me why. And also, he's on my
14 payroll. I wanted somebody to be on the payroll,
15 not an independent lawyer that I pay hourly raises.
16 That was the general idea here, because I knew that
17 there would be tons of tons of tons of legal
18 documents needed. And I had to have, I had to trust
19 someone 100 percent.
20    Q.  So you wanted Jesse to do this job because
21 you knew there would be enough legal-work needs
22 associated with the Melothe project --
23    A.  Yes.
24    Q.  -- that it would become cost prohibitive

Page 140

Syed Doha

1 to pay outside counsel?
2    A.  Correct.
3    Q.  So you wanted to have someone in-house?
4    A.  In-house, yes, exactly.
5    Q.  You have to stop talking --
6    A.  Sorry, sorry.
7    Q.  So you wanted someone inside that you
8 could pay just a flat salary to?
9    A.  Yes.
10   Q.  At the bottom of page 6, a paragraph
11 begins, "At the end of each fiscal year of the
12 Company/Parent," it goes on, "shall cause a
13 reasonable portion of the Company's/Parent's profits
14 for that fiscal year to be proportionately
15 distributed to the holders of equity securities of
16 the Company/Parent."
17       Do you see that?
18   A.  I see.
19   Q.  Suffice it to say, Jesse Rosenblatt was
20 never paid any profits on the Melothe project,
21 correct?
22   A.  Yes.
23       MR. CHOCIEY: There's a reference there.
24 I think you may have missed a reference there,

Page 141

Syed Doha

1 "(e.g., the Board)", John.
2       MR. DU WORS: You're correct. I meant to
3 make that explicit on the record because what I
4 said was, "it goes on to say."
5       MR. CHOCIEY: Oh.
6       MR. DU WORS: I was just skipping over it
7 to try to quote the operative language. But
8 yeah, you're correct. But I wasn't trying to
9 pull a fast one, I promise.
10   Q.  Anyway, suffice it to say, well, it is
11 true, is it not, that there were no profits
12 associated with the Melothe project?
13   A.  There were no revenues, let's start with
14 that.
15   Q.  It's hard to have a bottom line without a
16 top line.
17   A.  That's right.
18   Q.  Go ahead.
19   A.  No.
20   Q.  Turn to page 7. At the top it says, in
21 section (e) entitled "Capital of the Company. The
22 Company represents and warrants to Employee that it
23 currently possess sufficient funds in the Company's
24 bank accounts to fully operate its business and

36 (Pages 138 to 141)

One Penn Plaza, NYC                Toby Feldman, Inc.              (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS  (800) 246.4950

Page 158

```
 1        Syed Doha
 2     A.  And actually, you know, thinking of that,
 3  I mean, please remember that, you know, when you ask
 4  me about the cause of his, you know, termination,
 5  you know, after several hours of testimony, I may
 6  have simplified, but you know, we, we planned to,
 7  you know, present, you know, plenty of evidence to
 8  see, you know, how, how inadequate was his
 9  performance.
10     Q.  Jesse Rosenblatt?
11     A.  Yes.
12     Q.  Jesse Rosenblatt was terminated in early
13  July, correct?
14     A.  I'd really, I mean, in my mind, it's
15  somewhere between May and July.  I really have
16  faulty memory about that.
17     Q.  You said he came out here for Fourth of
18  July weekend.
19     A.  Right, it should be July, yes, yeah, yeah.
20     Q.  It was sometime around the Fourth of July
21  that he was terminated?
22     A.  Right, right, right, right.
23     Q.  He filed his lawsuit on July 15, 2011.
24     A.  Mm-hmm.
25     Q.  Within about a week.
```

Page 159

```
 1        Syed Doha
 2     A.  Mm-hmm.
 3     Q.  You know what?  I'm going to move on to
 4  another subject.  I'm irritating you and not asking
 5  questions well, and I'm going to move on to
 6  something pressing.
 7     A.  That this conflict, there's a lot of it is
 8  also very legal.  And otherwise, I'll be sitting
 9  here myself, as much as I like Ed.
10     Q.  So you and the other defendants assert
11  counterclaims in this case based on alleged
12  misrepresentations by Mr. Rosenblatt.  I want to go
13  through and make a comprehensive list, by
14  approximate date, of all of the misrepresentations
15  that you claim Mr. Rosenblatt made to you.
16     A.  I would rather, you know, I would rather
17  give it in writing to you because at this hour, I
18  mean, I feel like, you know, even with the causes,
19  you know, I feel like it was not succinct enough.  I
20  would rather get back to you on that, on it.
21     Q.  I understand.  Let's do both.  I
22  understand you want to supplement.
23     A.  Really because, you know, it won't do
24  enough justice because, you know.  I read for 30 --
25  I mean, I mean, if you want to keep me, you know,
```

Page 160

```
 1        Syed Doha
 2  I'll stay here, but you know.
 3     Q.  You have put that on the record.  That's
 4  reasonable.
 5     A.  Okay.
 6     Q.  I'm going to ask you for a comprehensive
 7  list.  And you're making it clear on the record, I'm
 8  tired and without time to prepare in writing, I
 9  don't know that I can give you a comprehensive list.
10     A.  Okay.  Go ahead and ask.
11     Q.  That said, I want to get a comprehensive
12  list of all the misrepresentations you claim
13  Mr. Rosenblatt made to you, to the extent you're
14  able to remember them as you sit here.
15     A.  Right.
16     Q.  Okay.  Knowing that it's the end of the
17  day and you're tired.
18     A.  Right.
19     Q.  Okay.  What are all the misrepresentations
20  you recall, as you sit here, that Mr. Rosenblatt
21  made to you?
22     A.  Okay.  That he will be able to open doors,
23  per se, for content partnerships.  He is, he claim
24  himself, claimed to be particularly well conversed
25  with law, entertainment laws, which he told me that
```

Page 161

```
 1        Syed Doha
 2  is essential event to schedule a meeting with
 3  Hollywood guys.
 4       This is how he put:  Well, if you go to
 5  Hollywood, you may have meetings, but if you don't
 6  go -- without a lawyer, this is actually very
 7  dangerous.  Honestly, I really trusted him when he
 8  said that because, you know, I had no idea as to how
 9  Hollywood operates.
10       But, you know, I was told, I mean, I saw
11  "Entourage", right?  And I was told like you don't
12  deal with these guys without a lawyer.  And this is
13  what he says, so that don't deal with -- this is
14  another, another, this will answer your question
15  about why, why did I need him when I had Ira
16  Pollack.
17       He says these are different kind, you have
18  to be, even, even in the industry and know the law
19  because these dealings that every, every dealing is
20  a legal dealing, Mr. Doha.  You have to sit down and
21  they should not even know that I'm a lawyer, but I
22  could tell you everything you say will matter, we'll
23  have to do deal memo right away.  That is why you
24  need me.
25       And you know, you know, Weinstein Company,
```

One Penn Plaza, NYC                 Toby Feldman, Inc.                      (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          (800) 246.4950

Page 162

```
 1              Syed Doha
 2   I mean, guess what, it was so funny because he says
 3   Harvey is, quote-unquote, is a terrible guy. You
 4   know, I did, I did international business with him.
 5   We actually have to check whether it was true. He
 6   said, but he really likes me.
 7           Guess what? One day we're in Tribeca
 8   Grand Hotel. You know, I'm having my coffee, and
 9   next to me is Harvey Weinstein. Guess who comes to
10   the meeting with me? Mr. Jesse Rosenblatt. He
11   passes through Harvey, Harvey Weinstein.
12           And I'm just watching. And he actually,
13   actually tried to like avoid him and come and see
14   me. I'm like, did you not see Harvey? Oh, oh, oh,
15   oh. So there's the point. When you talk to me, you
16   talk a big game of how he was such a big deal in
17   Weinstein Company. And then later on, I said go and
18   say hello to him at least. He didn't. Another
19   example of misrepresentation.
20           The example of misrepresentation is that,
21   you know, he certainly at every juncture knew, and
22   everyone knew, he was a full-time employee, but in
23   the contract I see that in his mind clearly that he
24   saw that he is also maintaining his own business.
25   That is beyond misrepresentation. That is fraud.
```

Page 163

```
 1              Syed Doha
 2           See again, I mean, I would rather put it
 3   succinctly, but clearly few specially relating,
 4   related to the, you know, how much he knows
 5   entertainment industry was a complete
 6   misrepresentation. He knew only few people and
 7   they're mostly his relatives or friends, and none of
 8   them really, you know, really mattered to our
 9   business.
10           For example, John Maata, his
11   brother-in-law or somehow connected to him, this is
12   supposed to be our asset. And the guy ends up
13   sending resume to me to become the CEO of the
14   company.
15           I mean, this guy, Jesse, you know, getting
16   hired to hire more people that they know, that's a
17   misrepresentation. I have, I'm pretty sure I still
18   have the, the, the, the email that Mr. John Maata,
19   President of Warner Brothers, send me with his
20   resume to me.
21           Do you think that's my business contact,
22   if he's sending me resume to work for me? Is that
23   my acquisition? Is that my asset that
24   Mr. Rosenblatt brings me to the company?
25       Q.  Did you say that you thought that Maata
```

Page 164

```
 1              Syed Doha
 2   was Rosenblatt's brother-in-law or something?
 3       A.  That is what he say. That what he tells
 4   me.
 5       Q.  Well, are you sure, because the actual
 6   relationship there is that Jesse Rosenblatt's wife,
 7   Sarah, nannied for John Maata for many years in her
 8   20s; are you sure that he told you that Maata is his
 9   brother-in-law?
10       A.  Mr. Du Wors, with ultimate certainty, I
11   can say that that's what he told me. I went to
12   dinner with, with Mr. and Mrs. Maata because I was
13   told, I was told, or I'm sorry, cousin somewhere, a
14   cousin or brother-in-law, one of, there was a
15   relationship involved.
16       Q.  All right. So as you sit here -- strike
17   that.
18           With respect to the misrepresentations you
19   claim Mr. Rosenblatt made to you in this case, the
20   misrepresentations you can remember as you sit here
21   are as follows:
22           One, he was able to open doors for content
23   partnerships with studios in Hollywood?
24       A.  Mm-hmm.
25       Q.  Two, he was a competent entertainment
```

Page 165

```
 1              Syed Doha
 2   lawyer?
 3       A.  Correct.
 4       Q.  Three, you needed a lawyer with you at
 5   meetings with Hollywood studios in order to avoid
 6   bad things happening in them?
 7       A.  Correct.
 8       Q.  Four, he had a good relationship with
 9   Harvey Weinstein when in reality he did not;
10           Five, he was well connected in the
11   entertainment industry;
12           Six, John Maata was a valuable business
13   contact and Rosenblatt's brother-in-law or cousin?
14       A.  Yes.
15       Q.  Have I accurately and completely stated --
16       A.  I would not say completely.
17       Q.  Hang on, hang on, hang on. Have I
18   accurately and completely stated all the
19   misrepresentations you claim in this case that
20   Rosenblatt made to you that you are able to remember
21   as you sit here in this deposition room at the end
22   of the day, subject to going home and completing a
23   written list?
24           MR. CHOCIEY: Object to the form of the
25   question. You can answer.
```

42 (Pages 162 to 165)

One Penn Plaza, NYC                 Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com   NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS       (800) 246.4950

### Page 200

1  Syed Doha
2  business and all of those was not part of his job,
3  then I have not made it very clear. So you could
4  correct your record on that.
5      Q.  Yesterday I asked you about the
6  misrepresentations you claim Mr. Rosenblatt made to
7  you in this lawsuit, and I want to know if you've
8  been able to recall any additional
9  misrepresentations since yesterday that you weren't
10 able to recall that Mr. Rosenblatt made to you that
11 you're accusing him of in this lawsuit in your and
12 the defendant's counterclaims. And so I want to
13 make sure first that I've got all six right and then
14 ask you if you can recall any others. So I recall
15 those six to be as follows:
16     First, he represented to you that he was
17 able to open doors to content relationships,
18 specifically with studios who would distribute films
19 that the Melothe project was going to deliver
20 online; have I got that one right?
21     MR. CHOCIEY: I will object to the --
22     THE WITNESS: I'm sorry.
23     MR. CHOCIEY: Excuse me. I will object to
24 the form of the question. It's been asked and
25 answered.

### Page 201

1  Syed Doha
2      A.  I was, I was thinking, it's a long
3  question, so go to the part of what was my testimony
4  so I can hear it again.
5      Q.  Well, maybe I will just, first I want to,
6  I'm going to list my understanding of the, well,
7  strike that.
8      I'm going to list the six categories of
9  misrepresentations you claim Mr. Rosenblatt made to
10 you and ask you if my understanding of them from
11 yesterday is correct. And then I'll ask if there
12 are any additional that you've been able to remember
13 since yesterday.
14     So starting with the six, I understand,
15 number one, you claim he represented that he was
16 able to open doors for the Melothe project to
17 content partnerships with studios;
18     Two, he represented he was competent in
19 entertainment law;
20     Three, he represented that it was
21 necessary for you to have a lawyer with you at
22 Hollywood studio meetings;
23     Four, he represented that he had a good
24 relationship with Harvey Weinstein, even though when
25 you encountered Mr. Weinstein at the Tribeca Grand

### Page 202

1  Syed Doha
2  Hotel, Mr. Rosenblatt actually avoided him;
3      Five, he represented that he was connected
4  in the entertainment industry;
5      And six, he represented that he had some
6  relation, either a cousin relationship or
7  brother-in-law relationship, with John Maata, the
8  COO of Warner Brothers Television, and that John
9  Maata was a valuable business contact, when in
10 reality, when you actually met Mr. Maata, he sent
11 you his resume and it turned out he was really
12 looking for a job from you.
13     Have I got those six accurately stated?
14     MR. CHOCIEY: Object to the form of the
15 question, it's been asked and answered.
16     A.  Okay, I think you have two questions. I
17 think the second question was -- first of all, let's
18 answer what you have just asked. Yes. But you have
19 also have asserted that, you know, you're asking if
20 I can remember more.
21     Q.  No, I'm getting there. I'm getting to
22 that question.
23     A.  Okay.
24     Q.  So in response to the question I just
25 asked, have I got those six representations or

### Page 203

1  Syed Doha
2  misrepresentations you're accusing Mr. Rosenblatt of
3  in this lawsuit correct, and your answer is yes?
4      MR. CHOCIEY: Object to the form. You can
5  answer.
6      A.  Fairly correct.
7      Q.  Okay. And then since yesterday, have you
8  been able to recall any additional
9  misrepresentations that you and other defendants in
10 this lawsuit claim Mr. Rosenblatt made?
11     MR. CHOCIEY: Object to the form. You can
12 answer.
13     A.  First of all, don't take it as sarcasm,
14 but when I leave depositions with you, I mean, you
15 know, I like you, Mr. Du Wors, the last thing I
16 think of is this case.
17     And I was with my family. And I had to
18 schedule, reschedule, my day today, that means my
19 day got started earlier, so if anything, I was not
20 thinking of recollecting anything. If anything, was
21 trying to forget the day.
22     Having said that, I do, I will add one
23 more, that he did represent to me that he would be,
24 he should be able to spearhead the public-relations
25 efforts of the company. Turned out to be not so
9 (Pages 200 to 203)

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com   NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          (800) 246.4950

Page 204

1      Syed Doha
2  efficient at that.
3      Q.  So in addition to the six
4  misrepresentations that you and the other defendants
5  claim Mr. Rosenblatt made to you as part of your
6  counterclaims -- strike that.
7      In addition to the other six categories of
8  misrepresentations that we just discussed that you
9  and the other defendants claim Mr. Rosenblatt made
10 as part of your counterclaims, you have recalled a
11 seventh since yesterday, which is that
12 Mr. Rosenblatt misrepresented that he would be able
13 to spearhead the company's public-relations efforts;
14 is that correct?
15     MR. CHOCIEY:  Object to the form of the
16 question.  You can answer.
17     A.  That is correct.
18     Q.  Okay.  With respect to the first
19 misrepresentation you claim Mr. Rosenblatt made,
20 specifically that he was able to open doors for
21 content partnerships, do you remember what
22 Mr. Rosenblatt actually said to you in that regard?
23     A.  No.
24     Q.  Do you remember when he said it to you?
25     A.  Not specifically, no.

Page 205

1      Syed Doha
2      Q.  Do you recall if it was before or after
3  his employment agreement was executed by you?
4      A.  Both.
5      Q.  Did you execute his employment agreement
6  and his consulting agreement at the same time?
7      A.  I don't recollect.  I don't remember.
8      Q.  Do you remember when you actually
9  executed--
10     A.  I don't remember, but obviously there is a
11 date and I would go by that.
12     Q.  Okay.  With respect to the second category
13 of misrepresentation, specifically that he said he
14 was competent in entertainment law, do you recall
15 what Mr. Rosenblatt specifically said to you in that
16 regard?
17     A.  No, I don't recollect specifically, but I
18 will certainly get back to you on that.
19     Q.  Do you recall when he made this
20 misrepresentation to you?
21     A.  Not specifically.
22     Q.  Do you recall if he made this
23 misrepresentation to you about being competent in
24 entertainment law before or after you signed his
25 employment agreement and consulting agreement?

Page 206

1      Syed Doha
2      A.  As per my recollection, before.
3      Q.  With respect to the third
4  misrepresentation you claim Mr. Rosenblatt made
5  specifically that you really needed to have a lawyer
6  with you for Hollywood studio meetings, do you
7  remember specifically what he said to you in that
8  regard?
9      A.  Specifically, no.
10     Q.  Do you remember when he said it to you?
11     A.  Specifically, I do not remember.
12     Q.  Do you recall if he said this to you
13 before or after you executed his employment and
14 consulting agreements?
15     A.  Ask me again, I'm sorry.
16     Q.  Do you recall if he made this
17 representation to you about you needing a lawyer for
18 Hollywood studio meetings before or after you
19 executed his consulting and employment agreements?
20     A.  That, certainly before.  Umm --
21     Q.  Yes?
22     A.  I know that you promised me I will be out
23 in two hours for this today.
24     Q.  Okay.
25     A.  I need a cup of coffee.  I know that your,

Page 207

1      Syed Doha
2  this series of questions, I know that you want to
3  ask me the series of questions, will that take more
4  than 10 minutes?  In that case, I would like to take
5  a break and get a cup of coffee.
6      Q.  I don't think so.  I think we can rip
7  through these in three minutes.  And if it goes
8  longer than just a few minutes --
9      A.  Okay, that's fine, no, that's fine.
10 Another 10 minutes is fine.  I really want to get it
11 done.
12     Q.  Sure.
13     A.  Even if need be without coffee.
14     Q.  Okay.  The fourth misrepresentation you
15 and the other defendants claim in your counterclaims
16 Mr. Rosenblatt made to you is that he had a good
17 connection with Harvey Weinstein, even though he
18 really didn't; do you remember specifically what
19 Mr. Rosenblatt said to you in this regard?
20     A.  Not specifically, but I certainly will
21 probe, because there was significant talk about it,
22 so, you know, I will certainly probe and, you know,
23 get back to you.
24     Q.  Do you remember when he said it to you?
25     A.  Not specifically.

10 (Pages 204 to 207)

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS           (800) 246.4950

Page 208

Syed Doha

1
2  MR. CHOCIEY: When you say, "when," you're
3  asking for a specific date, John?
4  MR. DU WORS: No, I don't need a date,
5  just a --
6  MR. CHOCIEY: With respect to any of these
7  questions, when you say specifically with
8  respect to timing.
9  MR. DU WORS: No, I don't need a date.
10 Approximation by month I think is just fine.
11 A. Oh, I see, okay.
12 Q. Does that change any of your previous
13 answers?
14 A. Not specifically because I'll have to go
15 back and think about it.
16 Q. Okay.
17 A. So yeah, but you know, the answer would be
18 most of these discussions were before the contract,
19 yes.
20 Q. Well, that's the third question. That is
21 not one that Mr. Chociey is addressing, I don't
22 believe, but okay.
23      So finally, do you recall if
24 Mr. Rosenblatt made this representation about having
25 a good connection with Harvey Weinstein before or

Page 209

Syed Doha

1
2  after you signed his consulting and employment
3  agreements?
4  A. That's certainly before the contract, that
5  I can certainly remember.
6  Q. The fifth misrepresentation you and the
7  other defendants claim in your counterclaim that
8  Mr. Rosenblatt made to you is that he was connected
9  in the entertainment industry; do you actually
10 recall what he specifically said to you in that
11 regard?
12 A. Specifically, no. I must add, Mr. Du
13 Wors, it's been almost two years. I don't think
14 about it every day. If anything, I want to forget.
15 This is a nightmare.
16      But certainly, you know, for your
17 purposes, I did tell my counsel here to cooperate as
18 much as possible and I would now. You're asking the
19 questions, so obviously those will clearly give me
20 the opportunity to, like, be more specific. And we
21 would like to get back to you, get back to you with
22 answers, as much as I can remember within the time
23 period given.
24      Still, I will have to emphasize, it's
25 going to be a painful process to remember because,

Page 210

Syed Doha

1
2  if anything, I'm trying to forget everything about
3  this, but go ahead -- sorry -- largely because I
4  trusted him so much, largely because it was such a
5  blatant breach of trust, not on a contractual basis,
6  but in a human-to-human-relationship basis.
7  Q. Do you remember when it was Mr. Rosenblatt
8  made this representation to you about being
9  connected in the entertainment industry?
10 A. Not specifically, but that was, I would
11 fair to say, very early on and continued, continued
12 to do so.
13 Q. When you say, "very early on," when is
14 that?
15 A. When, when he was seeking, seeking the job
16 in the company.
17 Q. And when did he begin communicating with
18 you about having a job in the company?
19 A. I don't remember specifically, but I would
20 say July of 2010, I mean, wow.
21 Q. And with respect to this sixth
22 misrepresentation you and other defendants claim in
23 this lawsuit Mr. Rosenblatt made specifically that
24 he was a relation of the valuable business contact,
25 John Maata, do you remember specifically what

Page 211

Syed Doha

1
2  Mr. Rosenblatt said to you in this regard?
3  MR. CHOCIEY: Object to the form. You can
4  answer.
5  A. No, I cannot give you specifics, but it
6  was very easy to find out that Mr. Maata was Warner
7  Brothers' president and, you know, I was impressed.
8  But beyond the relationship that he personally had
9  that Mr. Maata did not seem to be of any great
10 connection for the company.
11      As I said, he ended up sending his resume
12 to me to become the CEO of the company, which was,
13 you know, at that time I did consider a possibility,
14 you know, even if nothing from the PR point of view.
15 He was certainly a nice man -- and not was -- I
16 would say is, as far as I know, and you know.
17      But I don't think his acquaintance with --
18 he did not present his acquaintance with John Maata
19 in the premise of accusation of an executive to be
20 the case, rather -- do you understand what I am
21 saying?
22 Q. No.
23 A. Meaning, I mean, acquiring an executive is
24 also a part of the process, but that's not what he
25 represented to me. He represented Mr. Maata would

11 (Pages 208 to 211)

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com  NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS           (800) 246.4950

Page 212

```
 1            Syed Doha
 2   open up Warner Brothers' contents for me.  So that
 3   must be made clear.  His employment with the company
 4   was not what was considered Mr. Jesse Rosenblatt's
 5   contribution to the company.
 6      Q.  Didn't you testify in your last deposition
 7   in the Ordoubadi matter that you told John Maata you
 8   wanted to possibly hire him as CEO for the Melothe
 9   project because you wanted to step back yourself
10   from the day-to-day operations of the Melothe
11   project to focus on other important things?
12          MR. CHOCIEY:  Object to the form of the
13      question.  The transcripts in that other
14      lawsuit will speak for themselves.  You can
15      answer.
16      A.  That, that does not, that doesn't in any
17   way correct that Mr. Maata himself wanted to be
18   this, you know, accorded.
19      Q.  Whether it does contradict or doesn't
20   contradict isn't really my question.
21          My question is, isn't it true that you
22   told Mr. Maata you potentially wanted to hire him as
23   CEO because you wanted to step back from the day-to-
24   day operation of the Melothe project to focus on
25   other things?
```

Page 213

```
 1            Syed Doha
 2          MR. CHOCIEY:  Object to the form.  You can
 3      answer.
 4      A.  Quite possibly.
 5      Q.  Possibly; you're not sure?
 6      A.  I'm not, I'm not sure, but quite possibly.
 7      Q.  You're not sure that you told Mr. Maata
 8   that?
 9      A.  I'm not hundred-percent sure, but I would,
10   you know, seems like I have said that, yes, but, but
11   it was told to me before so that I could say it to
12   him.
13      Q.  It was what to you?
14      A.  It was told to me before that he is, he
15   would be interested.  And it was very fascinating
16   that after I mentioned that that I was, of course,
17   I'm meeting the president of Warner Brothers,
18   Mr. John Maata, and I'm no one known in the world of
19   entertainment, and I'm offering him a job to hire.
20          He took, he didn't take five minutes in
21   the elevator going down, he said, he said, he used a
22   very, he was very, very elated for the offer.  And
23   within five minutes of the offer that he expressed
24   interest immediately.
25      Q.  So the conversation with him was started
```

Page 214

```
 1            Syed Doha
 2   by you making the offer?
 3      A.  But I was told to me that he is also
 4   interested possibly joining the company before I
 5   made that offer.  Otherwise, I would find it almost,
 6   you know, inappropriate for a person that I'm trying
 7   to have content negotiation with and say, hey, by
 8   the way, would you want to work for me.
 9      Q.  Okay.  And you answered my last question
10   not with a yes or a no but the word "but" and some
11   more content, which is fine, I just want to make
12   sure I can follow up so I've got a clear record.
13      A.  Sure.
14      Q.  So your testimony is that with respect to
15   the subject of John Maata possibly coming to work as
16   the Melothe project's CEO, that conversation was
17   started by you offering him that position, not him
18   raising it first himself?
19          MR. CHOCIEY:  Object to the form of the
20      question.
21      A.  No, that's not what I said.  He indicated
22   through Jesse Rosenblatt to me that he may be even
23   interested in becoming the part of the, part of the
24   company.
25      Q.  And do you remember specifically what
```

Page 215

```
 1            Syed Doha
 2   Jesse Rosenblatt said to you in that regard?
 3      A.  Pretty much to the effect of what I just
 4   said, he may be interested in being part of the
 5   company.
 6      Q.  He said he may be interested?
 7      A.  Yes.
 8      Q.  Okay.  And then so after Jesse Rosenblatt
 9   said to you John Maata may be interested in being
10   part of the company, you met John Maata and offered
11   him the CEO position?
12      A.  Yes, after we had our otherwise-scheduled
13   meeting on content partnership.
14      Q.  And do you remember when it was that
15   Mr. Rosenblatt made this representation about having
16   a relation to the valuable business contact, John
17   Maata?
18      A.  No, I don't remember specifically.
19      Q.  Do you recall if it was before or after
20   you signed his employment agreement and consulting
21   agreement?
22      A.  I don't recall that.
23      Q.  The consulting agreement, like the
24   employment agreement, is dated August 23, 2010.
25          Do you believe, just as you believed about
```

12 (Pages 212 to 215)

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com   NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          (800) 246.4950

### Page 216

```
 1            Syed Doha
 2   the employment agreement, that you signed the
 3   consulting agreement on or about August 23, 2010?
 4       A.   That is correct, yes.
 5       Q.   And with respect to the last
 6   representation, then we will go get some coffee,
 7   with respect to that seventh misrepresentation that
 8   you remembered today that you and other defendants
 9   claim in your counterclaims Mr. Rosenblatt made,
10   specifically that he represented he would be able to
11   spearhead the company's public-relations efforts, do
12   you recall what specifically Mr. Rosenblatt said to
13   you in that regard?
14       A.   I would, I would not specifically use the
15   word, because I did not spearhead. I would say that
16   I don't think I said that.
17       Q.   Well, I think you did, but I've been wrong
18   before, so what I will ask you is --
19       A.   I like to be --
20       Q.   -- how would you best put it, do you
21   think?
22       A.   I wouldn't say spearhead as much as he
23   would be, you know, he would be able to, you know,
24   play a significant role. Let's put it that way.
25       Q.   Play a significant role?
```

### Page 217

```
 1            Syed Doha
 2       A.   Yes.
 3       Q.   Okay. So specifically what Mr.-- so is
 4   your testimony that you -- strike that.
 5            The misrepresentation that is that seventh
 6   category of misrepresentation we have been
 7   discussing is that Mr. Rosenblatt misrepresented
 8   that he could play a significant role in the
 9   company's public-relations efforts; is that right?
10       A.   Yes.
11       Q.   Do you remember specifically what he said
12   to you in that regard?
13       A.   That he knows people, that he thinks he
14   would be valuable and, because of his connection, he
15   could probably cost us less.
16            It so happened, if I can recollect
17   correctly, that I don't remember exactly which
18   company it was, he was not even able to get the
19   executive to come and even meet me, which again, was
20   quite stunning, given the kind of representation
21   that he made to me.
22            He made it almost impossible that he would
23   not even have a -- someone who is otherwise seeking
24   business with us would not show up. But I don't
25   know, I don't remember the specifics. Those
```

### Page 218

```
 1            Syed Doha
 2   specifics certainly we will provide to you as soon
 3   as possible.
 4       Q.   Do you remember when he said that to you?
 5       A.   Not specifically.
 6       Q.   Do you know if it was before or after you
 7   signed his consulting and employment agreements?
 8       A.   Not specifically, but I would incline to
 9   say after signing the agreement.
10       Q.   So that seventh misrepresentation that he
11   made about being able to play a significant role in
12   the company's public-relations efforts, that
13   couldn't have been a misrepresentation that induced
14   you to hire him, given that you actually signed his
15   consulting and employment agreements before he made
16   it; is that fair to say? Slow down.
17            MR. CHOCIEY:  Object to the form of the
18       question. Calls for a legal conclusion. You
19       can answer the question.
20       A.   Well, look, I'm trying to be --
21            MR. CHOCIEY:  And it misstates the
22       witness's testimony. You can answer.
23       A.   I'm trying to be as honest and truthful
24   with as much as I can recollect. I did not say with
25   certainty. I said I'm inclined to think that I
```

### Page 219

```
 1            Syed Doha
 2   would say later.
 3            It's quite possible that it was told to me
 4   before, so I would include it in the
 5   misrepresentations with the assumption that he may
 6   have said it before the contract was signed.
 7            I did not preclude the possibility that
 8   that was said. I said was inclined to think that
 9   was after the contract was signed. So let's make
10   it, let's correct that between you and I.
11       Q.   Okay, great.
12            MR. DU WORS:  Let's take that coffee
13       break.
14            THE VIDEOGRAPHER:  This concludes tape
15       number one. The time is 12:26 p.m. and we're
16       off the record.
17            (Whereupon, a brief recess was taken.)
18            THE VIDEOGRAPHER:  This begins tape
19       number two. The time is 12:41 p.m. and we are
20       back on the record.
21       Q.   You have never emailed with Heiner
22   Friedrich, correct?
23       A.   No.
24       Q.   And that's because he doesn't use email?
25       A.   I don't know whether he has an email
```

13 (Pages 216 to 219)

One Penn Plaza, NYC                Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com   NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS     (800) 246.4950